**CN**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, <u>ex rel.</u> | ) | CIVIL ACTION NO. 04cv5347 |
| ~~████████████████~~ | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MEDCO HEALTH SOLUTIONS, INC., MERCK- | ) | JURY TRIAL DEMANDED |
| MEDCO MANAGED CARE, L.L.C., MERCK & | ) | |
| CO., INC.; MERCK-MEDCO RX SERVICES OF | ) | |
| FLORIDA, L.C.; MERCK-MEDCO RX | ) | |
| SERVICES OF FLORIDA NO. 2, L.C.; MERCK- | ) | |
| MEDCO RX SERVICES OF FLORIDA, L.C. | ) | |
| NO. 4; MERCK-MEDCO RX SERVICES OF | ) | |
| MASSACHUSETTS, L.L.C.; MERCK-MEDCO | ) | |
| RX SERVICES OF NEVADA, INC.; MERCK- | ) | |
| MEDCO RX SERVICES OF NEW JERSEY, | ) | |
| L.L.C.; MERCK-MEDCO RX SERVICES OF | ) | |
| WILLINGBORO, NJ, L.L.C. MERCK-MEDCO | ) | |
| RX SERVICES OF NEW YORK, L.L.C.; | ) | |
| MERCK-MEDCO RX SERVICES OF OHIO, | ) | |
| LTD.; MERCK-MEDCO RX SERVICES OF OHIO | ) | |
| NO. 2,  LTD.; MERCK-MEDCO RX SERVICES | ) | |
| OF PENNSYLVANIA, L.L.C.; MERCK-MEDCO | ) | |
| RX SERVICES OF PENNSYLVANIA NO. 2, | ) | |
| L.L.C.; MERCK-MEDCO RX SERVICES OF | ) | |
| TEXAS, L.L.C.; MERCK-MEDCO RX SERVICES | ) | |
| OF VIRGINIA, L.L.C.; MERCK-MEDCO RX | ) | |
| SERVICES OF WASHINGTON, INC., THE | ) | |
| MERCK-MEDCO SUBSIDIARY OF | ) | |
| PARSIPPANY, NEW JERSEY; MERCK-MEDCO | ) | |
| SUBSIDIARY OF FAIRFIELD, OHIO; ANY | ) | |
| SUCCESSORS TO THE AFORELISTED | ) | |
| ENTITIES; MARK PROULX; JULIE WONG; | ) | |
| and, ELLIE GILBERT, | ) | |
| Defendants | ) | |

FILED NOV 16 2004

## COMPLAINT

Plaintiff ███████████████████████ brings this action on behalf of the United States of America, under the qui tam provisions of the Federal Civil False Claims Act ("FCA"), 30 U.S.C. § 3729 et seq., against Defendants Medco Health Solutions, Inc., Merck-Medco Managed Care L.L.C., and, Merck & Co, Inc. (collectively, "Medco"); Merck-Medco Rx Services of Florida, L.C., Merck-Medco Rx Services of Florida No. 2, L.C., Merck-Medco Rx Services of Florida, L.C. No. 4, Merck-Medco Rx Services of Massachusetts, L.L.C., Merck-Medco Rx Services of Nevada, Inc., Merck-Medco Rx Services of New Jersey, L.L.C., Merck-Medco Rx Services of Willingboro, NJ, L.L.C., Merck-Medco Rx Services of New York, L.L.C., Merck-Medco Rx Services of Ohio, Ltd., Merck-Medco Rx Services of Ohio No. 2, Ltd., Merck-Medco Rx Services of Pennsylvania, L.L.C., Merck-Medco Rx Services of Pennsylvania No. 2, L.L.C., Merck-Medco Rx Services of Texas, L.L.C., Merck-Medco Rx Services of Virginia, L.L.C., Merck-Medco Rx Services of Washington, Inc., the Merck-Medco Subsidiary of Parsippany, New Jersey, the Merck-Medco Subsidiary of Fairfield, Ohio, any successors to the aforelisted entities (hereinafter, collectively, the "Subsidiaries"); and, Mark Proulx, Ellie Gilbert, and Julie Wong (hereinafter, collectively, the "Individual Defendants").

### I. Introduction

1.      The FCA prohibits a party from submitting, or causing another to submit, a claim for payment to the United States of America ("United States" or "Federal Government") that the party knows is a false or unjustified claim.

2

2.     The FCA also permits private persons, called "relators," to file actions on behalf of the United States to recover the damages suffered by the United States as a result of false claims presented by a party to the Federal Government. See 31 U.S.C. § 3730(b).

3.     In return for notifying the United States of fraud perpetrated by a defendant, the relator, or whistleblower, is entitled to recover a portion of the damages and penalties awarded to the Federal Government at the conclusion of a successful suit. See 31 U.S.C. § 3730(d).

4.     In this action, ███████ seeks to recover damages and penalties on behalf of the United States arising from false claims made by Medco, the Subsidiaries, and the Individual Defendants, and presented by Medco to the United States in violation of the FCA.

5.     As more fully described below, Medco, the Subsidiaries, and the Individual Defendants falsified records relating to Medco's performance under contracts to provide professional pharmacy services, falsely reported filling prescriptions in the timeframes required by Medco's contractual obligations to the United States, and adopted corporate policies designed to conceal systematically their failure to adhere to the contractual performance standards.

6.     These actions constitute false claims submitted for payment to the United States for the provision of mail order pharmacy services for which the Federal Government is entitled to recover under the FCA.

## II. Parties

7.     Plaintiff is the United States.

8.     Relator, ███████ is an adult individual residing at ███████ ███████ who worked for Medco or one of the Subsidiaries from 1993 until April 2004.

9.     Defendant Merck & Co., Inc. ("Merck & Co.") is a corporation licensed to do business in Pennsylvania and conducts business in the Eastern District of Pennsylvania.

10.     In November 1993, Merck & Co. acquired a pharmacy benefit management business from Medco Containment Services, Inc., which Merck & Co. named Merck-Medco Managed Care, L.L.C. ("Merck-Medco Managed Care").

11.     Defendant Merck-Medco Managed Care is a Delaware limited liability company that, from November 1993 until August 2003, was a wholly owned subsidiary of Merck & Co.

12.     In 2003, Merck-Medco Managed Care ended its affiliation with Merck & Co. and became an independent publicly traded corporation known as Medco Health Solutions, Inc. ("Medco Health").

13.     Medco Health is a corporation that provides pharmacy benefit management services on behalf of state and federally funded health plans. Medco Health is licensed to do business in Pennsylvania and conducts business in the Eastern District of Pennsylvania.

14.     Medco Health operates pharmacies throughout the United States.

4

15.    Medco Health operates each pharmacy, the previously identified Subsidiaries, as a separate, wholly owned subsidiary of Medco Health.

16.    Defendant Merck-Medco Rx Services of Florida, L.C. has been a licensed pharmacy and a Medco Health subsidiary.

17.    Defendant Merck-Medco Rx Services of Florida No. 2, L.C. has been a licensed pharmacy and a Medco Health subsidiary.

18.    Defendant Merck-Medco Rx Services of Florida No. 4, L.C. has been a licensed pharmacy and a Medco Health subsidiary.

19.    Defendant Merck-Medco Rx Services of Massachusetts, L.L.C. has been a licensed pharmacy and a Medco Health subsidiary.

20.    Defendant Merck-Medco Rx Services of Nevada, Inc. has been a licensed pharmacy and a Medco Health subsidiary.

21.    Defendant Merck-Medco Rx Services of New Jersey, L.L.C. has been a licensed pharmacy and a Medco Health subsidiary.

22.    Defendant Merck-Medco Rx Services of Willingboro, NJ, L.L.C. has been a licensed pharmacy and a Medco Health subsidiary.

23.    Defendant Merck-Medco Rx Services of New York, L.L.C. has been a licensed pharmacy and a Medco Health subsidiary.

24.    Defendant Merck-Medco Rx Services of Ohio, Ltd. has been a licensed pharmacy and a Medco Health subsidiary.

25.    Defendant Merck-Medco Rx Services of Ohio No. 2, Ltd. has been a licensed pharmacy and a Medco Health subsidiary.

26.     Defendant Merck-Medco Rx Services of Pennsylvania, L.L.C. has been a licensed pharmacy and a Medco Health subsidiary.

27.     Defendant Merck-Medco Rx Services of Pennsylvania No. 2, L.L.C. has been a licensed pharmacy and a Medco Health subsidiary.

28.     Defendant Merck-Medco Rx Services of Texas, L.L.C. has been a licensed pharmacy and a Medco Health subsidiary.

29.     Defendant Merck-Medco Rx Services of Virginia, L.L.C. has been a licensed pharmacy and a Medco Health subsidiary.

30.     Defendant Merck-Medco Rx Services of Washington, Inc. has been a licensed pharmacy and a Medco Health subsidiary.

31.     Defendant Merck-Medco Subsidiary of Parsippany, New Jersey is the subsidiary of Medco Health doing business as a mail order pharmacy in Parsippany, New Jersey.  As of the filing of this action, Relator does not know the formal entity name of this Subsidiary, and so identifies this entity by the preceding sentence.

32.     Defendant Merck-Medco Subsidiary of Fairfield, Ohio is the subsidiary of Medco Health doing business as a mail order pharmacy in Fairfield, Ohio.  As of the filing of this action, Relator does not know the formal entity name of this Subsidiary, and so identifies this entity by the preceding sentence.

33.     Upon information and belief, one or more of the pharmacies described above in paragraphs 16-32, may now be operated, in the same location, by a different entity which is also a Medco Health subsidiary.  This action is brought also against such entities which are named in the caption as "any successors to the aforelisted entities."

34.     Defendant Mark Proulx is a corporate officer of Medco Health and its predecessor.

35.     Defendant Ellie Gilbert is a corporate officer of Medco Health and its predecessor.

36.     Defendant Julie Wong is a former corporate officer of Medco Health and its predecessor.

### III. Jurisdiction and Venue

37.     This Court has subject matter jurisdiction over this matter pursuant to 31 U.S.C. § 3732(a) (False Claims Act cases) and 28 U.S.C. § 1331 (claims arising under the laws of the United States).

38.     Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a) because Medco transacts business in this district, markets its services to entities in this district, is found in this district, and committed acts proscribed by 31 U.S.C. § 3729 in this district.

### IV. Medco's Business and Its Contracts With Government Entities

39.     Over 150,000,000 Americans have health insurance coverage that includes a pharmacy component, i.e., coverage where the insurer pays a portion of the cost of prescription drugs used by the insured.

40.     This pharmacy benefit is often managed by a pharmacy benefit manager, a business that specializes in administering a patient's pharmacy benefit in return for payment by a client. The client is usually an employer, health plan, government agency, or union to which the patient is connected.

41.   A pharmacy benefit manager performs numerous tasks for its clients, including:

    a.  providing patients, physicians, and clients with information about the operation of the pharmacy benefit;

    b.  organizing a network of retail pharmacies that fill prescriptions for a price negotiated in the client's contract;

    c.  operating mail order pharmacies that provide prescription drugs directly to patients;

    d.  providing expert advice concerning the design of prescription plans in order to provide a quality plan at a reasonable cost to the client and patients;

    e.  providing expert advice concerning the development and management of prescription drug formularies, which are lists of preferred drugs for which a plan will pay a benefit on behalf of the patient; and,

    f.  providing expert advice and assistance in obtaining discounts or rebates from drug manufacturers.

42.   Medco is a pharmacy benefit manager whose clients include United States Government agencies, as well as health plans for current and retired Federal employees and several Federal employee unions.

43.   In some cases, Medco has contracted directly with a United States Government agency to provide pharmacy benefit services to the employees of the

agency.  For example, Medco had such a contract with the Department of Defense until 2003.

44.     In instances in which Medco has a contract directly with a Federal Government agency, Medco submits claims for payment of services rendered under the contract directly to that agency.

45.     In other instances, Medco has contracts with unions that represent Federal Government employees.  Upon information and belief, Medco has such contracts with National Association of Letter Carriers, the American Postal Workers Union, and the Special Agents Mutual Benefit Association, among others.

46.     Where Medco has a contract with a union representing Federal employees, Medco submits claims for payment for services rendered under the contract to the union, which then requests payment of Medco's claim from the government entity whose employees the union represents.  Thus, payment to Medco for claims made under contracts with Federal employees' unions is made from Federal Government funds.

47.     Medco also has contracts with certain health plans that provide benefits to Federal Government employees.  Upon information and belief, Medco has such contracts with the Federal Employees Health Benefits Program ("FEHBP") and the Government Employees Hospital Association, Inc., among others.

48.     In instances where Medco's contract is with the health benefit plan, the health plan passes through the claims made by Medco for payment for services rendered under the contract to the United States.  Thus, payment to Medco for claims made under contracts with federal employees health plans is made from Federal Government funds.

49.     The United States agencies, unions, and health plans with which Medco had contracts are hereinafter referred to as the "Federal Clients."

50.     Medco's contracts with the Federal Clients are hereinafter referred to as the "Contracts."

## V. Services Medco Contracted to Provide

51.     Under the terms of the Contracts with the Federal Clients, Medco agreed to provide specific pharmacy benefit services.

52.     One of the primary services Medco contracted to provide was mail order pharmacy services.  Under this program, individual patients mail their prescriptions to a Medco pharmacy, that is, one of the Subsidiaries.  The Subsidiary fills the prescriptions and returns the medications to the patients through the mail.

53.     A patient submitting a prescription to be filled by mail must submit any portion of the prescription's cost that is required to be paid by the patient under patient's individual health plan.  Medco then bills the balance due on the cost of the prescription to the contracting party.

54.     Each of the Subsidiaries has been responsible for providing services in connection with delivery of mail order pharmacy services to patients under these Contracts.

55.     The Contracts for mail order pharmacy services included a number of quality assurance standards to guarantee that patients using the mail order service received the same quality prescription care as individuals who filled their prescriptions through traditional pharmacies.

56.    The Contracts each contained provisions requiring Medco to fill or refill prescriptions it received within a certain time frame of the date Medco received the prescriptions to ensure that the patients received their medication in a timely manner. For example, Medco was required under its contract with the Department of Defense to fill and mail back original prescriptions within five days of the date Medco received the prescription and to mail back refill prescriptions within two days of the date Medco received the prescription.  Similarly, under its contract with the FEHBP, Medco was required to fill and mail back original prescriptions within five days of the date Medco received the prescription.

57.    The Contracts also required Medco to have each prescription reviewed by a licensed pharmacist who would check:  1) whether the prescription would result in drug interactions with other medication the patient was taking; 2) whether the prescription was appropriate and in the proper dose for the patient's condition; and, 3) whether a generic or less costly drug could be safely substituted for the medication named in the prescription. Medco referred to this process of pharmacist review as "Drug Utilization Review."

58.    As part of the Drug Utilization Review, pharmacists at the Subsidiaries who identified a concern regarding a patient's prescription were required to contact the prescribing physician to resolve issues regarding the patient's drug history, duplicate therapy, improper dosing, drug allergy interactions, and fraud or abuse.

59.    The Contracts also required that, when Medco was unable to fill a prescription because of incomplete, inaccurate, or illegible information on the face of the

prescription, Medco would call the prescribing physicians to clarify the prescription, and then provide the medication to the patient.

60.     Additionally, the Contracts required Medco to establish a customer service program through which Medco would respond to patient inquiries regarding their medication and provide accurate information to the patient about the status of their prescription.

61.     The Contracts between Medco and its Federal Clients contemplated that Medco would perform these pharmacy services, in addition merely to filling the prescriptions.   The fees paid to Medco by the United States reflected the cost of performing these services.

62     The Contracts directed Medco to bill the client for the cost of filling the prescription when Medco mailed the prescription to the patient, which was the moment when Medco completed all of its functions regarding the prescription.

63.     In order to ensure that Medco met the requirements of the Contract and that the Federal Clients received these services, the Contracts included numerous quality standards and reporting requirements for Medco.

64.     Some Contracts included a guaranteed accuracy rate in filling prescriptions, and some required notification when an error occurred in dispensing medication to a patient.   For example, the FEHBP contract included a guaranteed accuracy rate in filling prescriptions of less than one error in 20,000 prescriptions.

65.     The Contracts also included a guarantee by Medco that it would dispense the prescriptions within the periods specified in the Contracts.  For example, the FEHBP

contract required Medco to dispense 99% of the prescriptions it received by mail within five business days of receipt.

66.    Due to the time limits for mailing filled prescriptions, the Contracts prohibited Medco from allowing a backlog of received, unfilled prescriptions to accumulate.

67.    The Contracts required Medco to submit reports of its compliance with the contractual provisions to the Federal Clients. Medco was obliged to issue reports to the contracting party that specified the number of prescriptions it had dispensed, the error rate that had occurred in dispensing the medication, the turnaround time in which the prescriptions were dispensed, and the number of prescriptions waiting to be filled.

68.    Further, the Contracts required Medco to notify the contracting party if it was unable to meet the standards set forth in the contract.

69.    The Contracts between Medco and its Federal Clients contemplated that Medco would perform these reporting and quality assurance services, and the fees paid to Medco included the cost of performing these services.

70.    In addition to paying for the services identified above, the Contracts often imposed monetary penalties on Medco if goals, including turnaround times, were not met, and provided for incentives, in the form of bonuses, if goals were exceeded.

## VI.  How Medco Processes and Tracks Prescriptions

### a.  The Role of the Subsidiaries

71.     While Medco contracted with the Federal Clients to provide pharmacy benefit services, the individual prescriptions received under the Contracts were mailed to the Subsidiaries.

72.     The Subsidiaries were responsible for filling the prescriptions and performing the associated review functions required by the Contracts.

73.     The Subsidiaries were also responsible for reporting to Medco regarding the handling of prescriptions and the compliance with the terms of the Contracts.

74.     Medco established the reporting procedures with which it required the Subsidiaries to comply, and the Subsidiaries performance was at the direction and with the knowledge of Medco.

### b.  The Processing and Tracking of Prescriptions

75.     A prescription that arrives at a Subsidiary to be filled goes through several steps before a completed prescription is returned to the patient.

76.     The Subsidiaries have in the past received, and continue to receive, prescriptions in their mailrooms.  How the Subsidiaries process the prescriptions after they leave the mailroom has changed over time.

77.     From 1993 though 2000, patient mail sending a prescription was opened in the mailroom of a pharmacy and an employee attached a "Mail Order Receipt Form" or "MORF" to the prescription. The MORF reflected the number of prescriptions in the envelope, the amount of the payment sent by the patient, and the form of payment.

14

Additionally, a mailroom employee stamped the envelope with the date the envelope was received. After the MORF was attached to the envelope and the envelope was date stamped, it was sent to an area called "coding."

78.    In the coding department, the prescription was reviewed and given a number that corresponded to the medication identified in the prescription. If the prescription was initially coded by a non-pharmacist, the prescription was sent to Level 2 coding, where a pharmacist reviewed the coded information for accuracy.

79.    A prescription was then sent from coding to data entry, where an employee entered the prescription into the computer system. When Medco employed the MORF system, the data entry clerk took the information on the MORF and entered it into the computer, including the information indicating the date Medco received the prescription.

80.    Sometime in 2000, Medco went "MORFless" and ended the process of attaching MORFs to envelopes. In a MORFless pharmacy, an envelope containing a prescription is slit open in the mailroom, but the prescriptions in the envelope are not counted or removed. The envelopes are then sent to data entry, and subsequently to an area called order completion, which is the MORFless equivalent of the coding department.

81.    About the time Medco went MORFless, it developed an automated system in some of its Subsidiaries, which involves placing prescriptions on a large scanner that makes an electronic photocopy of the prescription and enters the prescription into the

computer system.  Medco calls this automated prescription entry process "Alpha," and describes a pharmacy were it was used as an "Alpha pharmacy."

82.     In an Alpha pharmacy, envelopes received in the mailroom are slit open and sent to document preparation, where they are removed from the envelope and scanned into the computer system.  The scanned prescription is then sent to the data entry department, as in a non-automated, MORFless pharmacy.  The Alpha pharmacies do not have separate coding departments.

83.     In addition to receiving prescriptions by mail, Medco also received prescriptions through the internet, by phone, and directly from physicians.  After these prescriptions were entered into the Medco Computer Database, they were processed in the same manner as prescriptions received by mail.

84.     No matter which initial processing procedure Medco employed, the Medco corporate computer data system (the "Medco Computer Database") did not have a record of the actual prescription until the prescription passed through the data entry department.

85.     Medco's processing of prescriptions after the prescriptions left the data entry department (in a MORF or Alpha pharmacy) or the order completion department (in a MORFless pharmacy) has been uniform from 1993 through at least April 2004.

86.     From data entry or order completion, the prescription may go to a "protocol" department.  A prescription is sent to a protocol department if it requires further review before it can be dispensed.

87.     Protocol departments include Drug Utilization Review, where issues such as a prescribed medication's interactions with a patient's other drugs are resolved, and Doctor Call, where Medco makes calls to the prescribing doctor to resolve issues regarding the prescription.

88.     A prescription may pass through more than one protocol area.

89.     Once a prescription leaves protocol, it is sent to dispensing, where the prescription is filled.

90.     In some Subsidiaries, dispensing is done manually by Medco employees, and then checked by a pharmacist for accuracy.  In others, Medco uses a machine that fills the prescriptions automatically.  Prescriptions that are filled using the automated system are not checked for accuracy before mailing.

91.     After a prescription is dispensed, it is packed and prepared for mailing, and shipped to the patient.

92.     The receipt, coding, data entry, and protocol functions performed by Medco were known throughout Medco as "Front End Processing" or "Prescription Processing."

93.     The dispensing, checking, packing, mail preparation, and shipping functions performed by Medco are known throughout Medco as "Back End Processing" or "Dispensing Processing."

94.     Medco developed a prescription processing system known as ARX, which enabled a pharmacy to have the prescription entered, subjected to protocols, and reviewed

as part of Front End Processing, and then to send the prescription through the computer to another Subsidiary, which could complete the Back End Processing.

95.     To take advantage of this capability, Medco created pharmacies that specialized in either Front End Processing or Back End Processing, i.e., there were some Subsidiaries that did only prescription entry and review and some that did only dispensing and mailing.

96.     While some Subsidiaries still perform both Front End Processing and Back End Processing, the majority perform a specialized function.

97.     Medco attempted to track prescriptions as they went through Medco's processing system, so that it could determine the amount of time it took Medco to perform each function, and thereby ascertain its highest cost areas.

98.     The Medco Computer Database was used to track the number of prescriptions in each function area, but could not do so effectively.  For example, the Medco Computer Database had no record of prescriptions before they passed through data entry, so it could not track prescriptions in the early stages of processing.

99.     Additionally, it was possible to alter the number of prescriptions recorded by Medco personnel in spreadsheets which were used to generate reports to Medco management without any corresponding change to the actual number of prescriptions in the individual pharmacies.

100.    Upon information and belief, Medco created the reports that it was contractually obligated to provided to its Federal Clients, regarding performance, turnaround times, and backlog, using data obtained from the Medco Computer Database.

## VII. <u>The Violations of the Contracts</u>

101.    Medco has systematically failed to provide the services it guaranteed in the Contracts to provide to the Federal Clients.

102.    The Subsidiaries, with the knowledge and direction of Medco, falsified records to indicate that Medco was performing to the standards specified in the Contracts, when in reality, Medco failed to meet the Contracts' standards or simply failed to perform a required service.

103.    Medco corporate management was aware of the systemic and pervasive inaccuracies and the unreliability of the figures in documents submitted to the Federal Clients.

104.    The Individual Defendants were aware of the systemic and pervasive inaccuracies and the unreliability of the figures in documents submitted to the Federal Clients, and caused to be created and submitted the reports provided to the Federal Clients knowing that the reports were false.

### a. Falsifying Receipt Dates

105.    Medco knew that it was contractually obligated to dispense prescriptions within a certain number of days of receipt and knew that it would suffer penalties for failure to meet these contractual obligations.

106.    Medco had difficulty meeting the contractual turnaround times and acted, with the Subsidiaries, to falsify the dates that it received prescriptions.

107.    On occasions, Medco would sometimes resend mail, which had already been received by one Subsidiary, to another Subsidiary, including on those occasions

when Medco received mail at a Subsidiary and, based upon the amount of available labor at that pharmacy, concluded that the pharmacy could not process that mail within the time period allowed under the contract.  When the second Subsidiary received the mailed prescriptions, it entered the prescription with a received date using the date that the second pharmacy had received the mail, although the prescription had been received by Medco at the first pharmacy at least one day earlier.  This resulted in Medco submitting false reports of completion time and false bills for completed prescriptions.

108.   Medco was required to get the permission of some of the Federal Clients before shipping the prescriptions to another pharmacy, but Medco did not do so before it forwarded the prescriptions.

109.   Some Subsidiaries received mail twice a day.   For example, at the pharmacy operating as Merck-Medco Rx Services of Texas, L.L.C. (the "Texas Pharmacy"), the pharmacy and the U.S. Post Office would communicate between the first and second mail delivery to find out how much mail Post Office was going to deliver during the second delivery.  If the Post Office indicated there was more mail than the Texas Pharmacy believed it could process within the prescribed periods, the employee would instruct the Post Office not to make the second delivery and to hold all the mail until the next day.  This resulted in mail not being received by Medco and entered on the correct date, and in Medco submitting false reports of completion time and false bills for completed prescriptions.

110.   Some Subsidiaries, including Merck-Medco Rx Services of No. 4, L.C. ("the Florida 4 Pharmacy"), left received mail unopened in the mailroom without

processing or scanning it on the date received.  This resulted in mail not being entered by Medco on the date it received the prescription, and in Medco submitting false reports of completion time and false bills for completed prescriptions.

111.    Additionally, pharmacies using the Alpha system experienced a certain number of prescriptions each day that were not scanned properly because of a mechanical error or were otherwise rejected by Alpha.  These prescriptions were referred to as "failed batches."  The failed batches were re-scanned into the system on the following day, and may have been marked as received on the date they were successfully scanned, not the date they were actually received.  This resulted in mail not being entered by Medco on the correct date and in Medco submitting false reports of completion time for prescriptions and false bills for completed prescriptions.

112.    Some Contracts specifically required Medco to enter the prescriptions on the date it received them.  The Subsidiaries, on occasion, entered false received dates for prescriptions, knowing that these dates would be used by Medco to submit false claims for payment to the Federal Clients, Medco breached these Contracts by entering improperly the received date.  Medco, knowing that the received dates entered by the Subsidiaries were false or inaccurate, breached the Contracts by submitting claims to the Federal Clients that were based upon the unreliable and deceptive data received from the Subsidiaries.

113.    Additionally, Medco falsely reported its turnaround times to its Federal Clients, because it reports reflected inaccurate receipt dates for tens of thousands of prescriptions.

**b. Falsifying Completion Dates**

114.    In order to appear to meet its contractual turnaround times, Medco, with the Subsidiaries, also systematically falsified the dates on which it sent out completed prescription.

115.    From 1993 until 2002, Medco took credit in its Medco Computer Database for completing a prescription, and sent a bill to the Federal Client for the prescription, when a pharmacist checked the filled prescription for accuracy during Back End Processing.

116.    Although Medco took credit for the prescription when it was checked, the prescription still had to be packed for shipping, prepared for mailing, and actually mailed (that is, delivered to the custody of the U.S. Postal Service) before Medco satisfied the standards for completing a prescription, as specified in the Contracts.  As the packing, mail preparation, and mailing often did not occur on the date the prescription was checked, Medco's policy of taking credit for filling the prescription at the time of checking resulted in Medco falsely claiming prescriptions were completed one or more days before the actual completion time.  Because the Subsidiaries placed the prescription on the list of completed prescriptions and Medco sent a bill for the prescription using the time of checking as the completion time, Medco's policy resulted in Medco falsely billing for prescriptions it had not yet completed.

117.    Some Subsidiaries, on occasion, had tens of thousands of prescriptions that had been dispensed and checked, but not mailed, sitting in the pharmacies.

118.   From 2002 until the present, Medco took credit in the Medco Computer Database for completing a prescription, and sent a bill to the Federal Client for the prescription, when the prescription was packed and made ready for mailing, a process Medco refers to as "manifesting."

119.   Although Medco took credit for the prescription as it was manifested, the prescription still had to be placed in the mail before Medco satisfied the standards for completing a prescription, as specified in the Contracts.  As mailing often did not occur on the date the prescription was manifested, Medco's policy of taking credit for filling the prescription at the time of checking resulted in Medco falsely claiming prescriptions were completed one or more days before the actual completion time.  As Medco placed the prescription on the list of completed prescriptions and sent a bill for the prescription at the time of manifesting, Medco's policy resulted in Medco falsely billing for prescriptions it had not yet completed.

120.   Some of the Subsidiaries that operated on Saturday took credit for completing prescriptions on Friday, when the prescriptions were actually completed on Saturday, during the period before the U.S. Postal Service picked up the mail on Saturday.  This practice of listing all prescriptions that were completed before the U.S. Postal Service picked up outgoing mail on Saturday as having been completed on Friday resulted in false reports of completion time and false bills for completed prescriptions.

121.   In some Subsidiaries, the U.S. Postal Service picked up outgoing mail in the early evening hours, for example, around 7:00 p.m.  Some Subsidiaries continued to manifest prescriptions after that mail pick-up and to mark those prescriptions as being

completed on the calendar date on which they were manifested. However, because the prescriptions manifested after the last pick-up by the Postal Service could not be delivered to the custody of the Postal Service until the next day, these prescriptions were not actually completed under the terms of the Contract on the date they were manifested and marked as completed. This practice resulted in Medco submitting false reports of completion time and false bills for completed prescriptions.

### c. Nevada Practices

122.    At the pharmacy operating as Merck-Medco Rx Services of Nevada, Inc. (the "Nevada Pharmacy"), which was an automated Back End pharmacy using the automated dispensing system, Medco reported a prescription as completed and filled when it was placed in an appropriate mail bag.

123.    The Nevada Pharmacy had numerous mailbags, divided by the zip codes of the patients receiving the medication. Not all mailbags left the Nevada Pharmacy every day. Due to the cost of mailing mailbags that were not completely full, Medco held mailbags of orders for a day or more until the mailbags contained enough packages to make it cost effective to mail them. Mailbags for some zip codes filled up quickly and left the pharmacy promptly, but others did not.

124.    Prescriptions that had been marked as completed and shipped when they were placed in these mailbags, but then waited additional days in the mailbags before being delivered to the U.S. Postal Service, were not completed prescriptions under the terms of the Contracts. As Medco submitted a bill to the plan for the prescriptions at the moment the system indicated the prescriptions were complete, Medco's policy of

allowing filled prescriptions to sit in mail bags for one or more days before mailing while taking crediting for completing the prescription resulted in false reports of completion time and false bills for completed prescriptions.

125.    The Medco Computer Database counted as prescriptions completed on a given day all the prescriptions that had been entered into the Medco Computer Database as complete by 11:59 p.m. Eastern Time on that date.  As the Nevada Pharmacy was located in the Pacific time zone, the Medco computer system counted as completed prescriptions at the Nevada Pharmacy all prescriptions entered into the computer system as complete by 8:59 p.m. Pacific Time on the given date.

126.    On occasion, the Nevada Pharmacy requested that Medco increase the number of prescriptions that the Medco Computer Database indicated that the Nevada Pharmacy had completed in a given day.  The Nevada Pharmacy made this request on the basis that the Medco Computer Database had not captured prescriptions completed after 8:59 p.m. Pacific Time.   Medco, on occasion, altered the information in the Medco Computer Database to indicate that the Nevada Pharmacy had completed several thousand more prescriptions than the database indicated.  Medco had no uniform policy for how to deal with the Nevada Pharmacy's requests.   Therefore, the prescriptions completed at the Nevada Pharmacy were sometimes credited to the date of completion based on Eastern Time and sometimes to the date of completion based on Pacific Time, depending upon which method aided Medco's turnaround statistics.

### d.    Falsifying Turnaround Reports

127.    The Contracts required Medco to submit reports to the Federal Clients indicating its progress in meeting turnaround times and reporting the number of prescriptions it was handling.

128.    Upon information and belief, Medco and the Subsidiaries used the data from the Medco Computer Database and the computerized reports created from it to formulate the reports it was required by the Contracts to provide to the Federal Clients.

129.    The Medco Computer Database was systematically inaccurate and Medco knew this.

130.    The numbers in the Medco Computer Database were not always accurate numbers, but rather were guesses or estimates based upon often outdated assumptions.

131.    Specifically, the count of prescriptions waiting in the mailroom to be sent to the next processing stage was not an accurate or true count.

132.    Patients often mailed a Subsidiary more than one prescription in a single envelope.  Consequently, a simple count of envelopes would not yield an accurate number of prescriptions waiting in the mailroom.  To count prescriptions in a MORFless pharmacy, Medco counted the number of envelopes and then multiplied it by a number, called a "factor," that supposedly represented the average number of prescriptions normally found in a single envelope, and thus determined the mail count.  For example, if 100 envelopes were in the mailroom and the factor was 1.6, meaning envelopes contained 1.6 prescriptions on average, Medco multiplied these numbers to arrive at a count of 160 prescriptions in the mailroom.

133.   The factor by which the mail was multiplied was sometimes based upon an audit of mail to determine the average number of pieces, but these audits were not conducted at all Subsidiaries and were not uniform in time or manner.  Medco did not know, and did not try to determine systematically, if the factor being used by a pharmacy was an accurate estimate.  Thus, Medco knew that the factor was not reliable but did not disclose to its Federal Clients either the use of the factor formula or the unreliability of its count of received prescriptions.

134.   Moreover, because the Medco Computer Database did not have an actual record of prescriptions until they passed through data entry, Medco had no way to verify the mailroom count, or the counts of prescriptions in other processing areas prior to data entry.

135.   Additionally, prescriptions from a single patient were not separated at a specific point in the Front End Processing; thus, at any point in this processing, a single order could contain more than one prescription.  Thus, some Front End Processing counts, other than the mail count, were also multiplied by a factor to account for multiple prescriptions from a patient.  Again, the number used to report the prescriptions was not an accurate number, but a guess or an unreliable estimate.

136.   The Nevada Pharmacy, under pressure from Medco corporate management to complete prescriptions in a timely manner, daily falsified reports to Medco corporate management to show that it had no prescriptions that had been dispensed but were waiting to be packaged.

137.   Each pharmacy was to count on a daily basis the number of prescriptions received but not completely processed by that pharmacy, and that number was called the "backlog." The backlog was counted by two independent methods, called the "counted backlog" and the "computed backlog." On some occasions when these two methods yielded discrepant numbers, Medco employees made unsubstantiated changes to the figures used to calculate the computed backlog (e.g., the number of "receipts" and/or "cancels" were altered), so that the two backlog calculations would correspond. The only purpose for making these charges was to create false numbers that corresponded.

138.   Although Medco was required to issue reports to the Federal Clients based upon the prescriptions handled for the individual client, Medco did not have a method for tracking incoming mail by client.

139.   At Florida 4 Pharmacy, Medco handled prescriptions primarily for the FEHBP. Medco estimated that approximately 94% of its business at this pharmacy was work for the FEHBP. Medco simply multiplied its estimates for the total number of prescriptions filled at the pharmacy by 94% to determine the number of prescriptions handled for the FEHBP. Medco reported this number to the FEHBP as an accurate number, whereas it was only an estimate based on data Medco knew to be unreliable.

140.   The Contracts also required Medco to send letters to patients informing them if Medco cancelled a prescription for any reason. The Medco Computer Database records that prescriptions have been canceled when an employee performs the appropriate computer function to release the prescription from the system because it is a canceled prescription. The function that releases the prescription also generates a letter to

the patient, which the Medco Computer Database records as having been sent to the patient at the moment it is created. Often the cancellation letters were not sent for many days after Medco Computer Database recorded the letter as sent and the prescription as cancelled. The Medco Computer Database's failure to capture this discrepancy resulted in resulted in Medco submitting false reports of canceled prescriptions and false reports of compliance with the requirement to notify patients of cancellations.

141.    Upon information and belief, at the pharmacy operating as Merck-Medco Rx Services of Pennsylvania No. 2, L.L.C. (the "Pittsburgh Pharmacy"), turnaround times (the time from receipt to completion of a prescription) were falsified by improperly using the procedure known as "Wait Seven."

142.    Wait Seven was a procedure whereby:  1) a prescription, submitted by a patient who had unpaid co-payments for prior prescriptions in excess of a certain limit (known as the "floor limit," which was set by agreement between Medco and its Federal Client), would be so identified at the data entry stage of prescription processing and then sent to the accounts receivable department of the pharmacy; 2) accounts receivable personnel were to call the patient and request payment of outstanding prescription co-payments; 3) upon assurance from the patient that such payment would be forthcoming, the pending prescription was placed in the "Wait Seven" category, meaning the pharmacy would wait up to seven days to receive the payment; and, 4) upon receipt of the payment, the pending prescription would be released from the Wait Seven holding category, and be processed and dispensed.

143.   Upon information and belief, under the Contracts with its Federal Clients, days during which a prescription was designated as being in the Wait Seven category were not included in the calculation of turnaround time for that prescription. For example, if a Subsidiary received a prescription on Day 1, placed the prescription in the Wait Seven category on Day 2, released the prescription from the Wait Seven category on Day 7 when the co-payment was received, and mailed the prescription to the patient on Day 8, the turnaround time for the prescription would be 3 days, because the 5 days during which the prescription remained in the Wait Seven category do not count toward turnaround time.

144.   Upon information and belief, the Pittsburgh Pharmacy, at some times prior to 2004, at the direction of the General Manager or Vice-President of Operations thereof, intentionally designated received prescriptions that did not belong in the Wait Severn category as belonging in the Wait Seven category so as to enable the Pittsburgh Pharmacy to misrepresent the actual turnaround times for such prescriptions, because the days such prescriptions were designated as "Wait Seven" were not "counted" as days in the calculation of turnaround time. This practice resulted in Medco submitting false reports of completion time and false bills for completed prescriptions.

145.   Upon information and belief, Robert Raffalo, at the time he was General Manager or Vice President of Operations of the Pittsburgh Pharmacy, shared with some other Managers of other Subsidiaries the fact that the above-described improper practice with regard to Wait Seven was intentionally used at the Pittsburgh Pharmacy to appear to achieve turnaround time results which were known to be false.

146.    As a result of the numerous guesses, unreliable estimates, and falsifications in the data entered into the Medco Computer Database, the Medco Computer Database contained inaccuracies in the magnitude of tens of thousands of prescriptions.

147.    Upon information and belief, Medco presented reports to the Federal Clients using the Medco Computer Database numbers and represented that the numbers were an accurate reflection of Medco's processing of the Federal Clients' prescriptions.

148.    The reports based upon the Medco Computer Database were false and Medco knew they were false when Medco presented them to the Federal Clients.  Medco, in fact, had no way to determine accurate numbers to give to the Federal Clients.

149.    The use of the Medco Computer Database numbers allowed Medco to represent falsely to Federal Clients that Medco had met performance standards in its Contracts, and to receive bonuses for meeting contractual goals, and to avoid penalties for non-compliance, when, in fact, its performance did not meet its contractual standards.

### e.  Falsifying Doctor Call Reports

150.    As explained above, the Contracts required Medco, through licensed pharmacists, to call prescribing physicians to resolve issues with individual prescriptions, including issues regarding improper dosage, drug interaction, and illegible handwriting.

151.    Medco's official procedure for these calls was to attempt to contact the doctor's office at least twice, and if the doctor did not respond, to cancel the prescription and return it to the patient.

152.    The Texas Pharmacy did not adhere to the official procedure for doctor calls. Rather, this pharmacy would send one fax to the physician's office, and if it did not receive a reply, would cancel the prescription.

153.    When Medco's corporate management learned of the Texas Pharmacy's handling of doctor calls, rather than denouncing the practice, the management identified the Texas Pharmacy as using "best practices" and encouraged other pharmacies to imitate the Texas Pharmacy's procedures.

154.    The practice of not calling physicians to review prescriptions saved Medco the labor costs of making repeated phone calls, but violated the Contracts' requirements that Medco review prescriptions and attempt to resolve any problems associated with them.

155.    Medco's handling of doctor calls resulted in numerous prescriptions not receiving the review that they were supposed to receive under the Contracts; and Medco's presentation of bills to Federal Clients pursuant to such Contracts constituted false claims for these services that Medco had not rendered.

156.    Medco's failure to handle properly prescriptions requiring doctor calls allowed Medco to cancel improperly many prescriptions that it would otherwise have been required to fill. Because cancelled prescriptions did not count towards Medco's contractual requirements to complete prescriptions within specified periods, the improper cancellation of prescriptions appeared to improve Medco's performance in meeting its contractual requirements.

157.   Medco's improper cancellation of prescriptions resulted in Medco submitting false reports regarding the percentage of prescriptions completed in a timely manner.

**f.  Falsifying the Reporting of Errors**

158.   As explained above, Medco also was required to submit reports of errors in dispensing prescriptions, either immediately or in cumulative reports to the Federal Clients.

159.   Until 2003, Medco did not have a policy regarding how individual Subsidiaries were to identify errors.

160.   Normally, a pharmacy would learn of an error through a patient complaint to its customer service number.   Once a complaint was received, the decision as to whether an error had been committed in filling the prescription was left to the discretion of the manager of the individual pharmacy.

161.   When a manager determined that an error had been made, the error was reported as an "external non-conformity."  Upon information and belief, the Subsidiaries systematically failed to report external non-conformities to Medco management, and Medco management was aware that the external non-conformities were not being reported.

162.   Upon information and belief, until its closure in 2003, the Medco pharmacy operating as Merck-Medco Rx Services of Massachusetts, L.L.C. consistently falsely reported that it had experienced no external non-conformities.

163.    Medco's failure to report the errors in filling the prescriptions was a violation of the Contracts, and resulted in false reports regarding error rates being submitted to the Federal Clients.

164.    Several states in which Subsidiaries were located had laws or regulations requiring the reporting of errors in the dispensing of pharmaceuticals.

165.    Medco's failure to report the errors to the individual states was a violation of state pharmacy laws and, consequently, a violation of the Contracts, which required Medco to operate in conformity with state pharmacy laws.

**g.  Failure to Conform to Nevada's Pharmacy Laws**

166.    Upon information and belief, Medco was aware prior to December 2002 of the state law requiring pharmacy technicians in the Nevada Pharmacy to be supervised by licensed pharmacists in a certain ratio.  Medco attempted to avoid this law by directing its technician employees to indicate on their computerized time sheets that they were performing tasks that did not require the supervision of licensed pharmacists, when in fact they were performing tasks that required such supervision.

167.    This failure to conform to state pharmacy law was a violation of the Contracts, which required Medco to conform to the same standards as a traditional pharmacy.

168.    Prescriptions that were processed without the proper oversight of a licensed pharmacist were not processed in the manner specified in the Contracts, and Medco's bills for these prescriptions constitute bills for services not rendered.

### h. The Prescription Backlog

169.   At the end of 2003, Medco was in crisis, as it had a backlog of approximately 800,000 prescriptions waiting to be filled.

170.   Medco did not inform the Federal Clients of the backlog or indicate that it was having any trouble meeting the standards set forth in the Contracts.

171.   Both the creation of the aforesaid huge prescription backlog and the failure to report the problem to the Federal Clients were violations of the Contracts.

### i. The Concealment of the Improper Conduct

172.   Medco, the Subsidiaries, and the Individual Defendants, through the pervasiveness of their fraud, deliberately created a system with so many errors and inaccuracies, and so it is impracticable or impossible, as to each and every individual prescription, to establish whether Medco performed its obligations under the Contracts.

173.   By falsifying data regarding individual prescriptions at numerous places in its processing system in such a way that the fraud as to each specific prescription cannot be determined by a review of the computer data, e.g. by failing to enter mail on the date received, Medco, the Subsidiaries, and the Individual Defendants attempted to conceal their improper conduct from discovery.

174.   Similarly, by systematically falsifying aggregate data in the Medco Computer Database so that individual false manipulations would not be discovered, Medco, the Subsidiaries, and the Individual Defendants attempted to conceal their improper conduct from discovery.

175.     Medco, the Subsidiaries, and the Individual Defendants, therefore, acted not only to falsify Medco's claims to the Federal Clients, but also to conceal their improper conduct.

**VIII.  <u>The False Reports in Response to Federal Government Request for Proposals</u>**

176.     To obtain its Contracts with the Federal Clients, Medco submitted responses to requests for proposals issued by the Federal agencies, unions, and health plans.

177.     The responses explained how Medco planned to fulfill the contracts, if granted, and its current performance in handling prescriptions.

178.     Medco used data from the Medco Computer Database to complete its proposals for the contracts.

179.     As the information in the Medco Computer Database was systematically inaccurate, and Medco knew of the inaccuracies, Medco knowingly submitted proposals to the Federal Government that contained inaccurate information.

**IX.  <u>The Role of the Subsidiaries</u>**

180.     The Subsidiaries each knew that the Contracts contained turnaround times with which they were required to comply in order for Medco to receive payment for filling the prescriptions, earn payment of bonuses, and avoid the imposition of penalties.

181     The Subsidiaries each manipulated data regarding turnaround times, mail receipt dates, mailing dates for prescriptions, doctor call compliance, prescription errors, the drug utilization review process, and conformance with pharmacy laws, knowing that the manipulated data would be used to submit claims to the Federal Clients for payment

under the Contracts, to establish compliance with the Contracts, and to submit requests for future contracts.

182. The Subsidiaries knowingly created false reports that they knew would be used to submit claims to the Federal Clients for payment under, and to establish compliance with, the Contracts.

183. Medco was aware of the conduct of the Subsidiaries, directed the aforesaid conduct, and failed to halt the conduct regarding the manipulation of data and the creation of false reports.

184. Medco used the manipulated data and false reports created by the Subsidiaries to submit claims to the Federal Clients, and did so knowing that the data and reports created by the Subsidiaries was false.

**X.  Claims Against Medco, the Subsidiaries, and the Individual Defendants**

**Count I**
**Violation of § 3729(a)(1) of the False Claims Act**

185. The foregoing paragraphs of this Complaint are incorporated herein by reference as if set forth at length.

186. Section 3729(a)(1) of the FCA provides liability for anyone who knowingly presents, or causes to be presented, to an officer or employee of the United States government, a false or fraudulent claim for payment or approval. See 31 U.S.C. § 3729(a)(1).

187. Medco's claims for payment for the filling of prescriptions, its claims for bonuses, and its reports that it was not subject to the payment of penalties under its

Contracts with the Federal Clients, were claims presented to the United States either directly or through the intervening union or health plan.

188.   The claims were false for the reasons specified in Sections VII and VIII, above.

189.   From 1993 through at least April 2004, Medco submitted these claims to the United States knowing that the claims were false for the purpose of obtaining payment of false claims from the United States and for obtaining new contracts with the United States.

190.   As a result of the false claims, the United States was damaged in that it paid for services that purported to, but did not, comply with the Contracts, paid for contractual bonuses that Medco did not earn, and failed to recover contractual penalties incurred by Medco.

191.   Due to the pervasive fraud engaged in by Medco and the Subsidiaries, Medco should be required to disgorge and pay to the United States all monies paid to Medco under the Contracts.

WHEREFORE, ▮▮▮▮▮▮▮ requests entry of judgment in favor of the United States, and against Merck & Co., Merck-Medco Managed Care, Medco Health, and the Subsidiaries, in an amount equal to triple the damages sustained by reason of their conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, plus ▮▮ reasonable attorney fees, expenses, and costs.

## Count II
## Violation of § 3729(a)(2) of the False Claims Act

192.    The foregoing paragraphs of this Complaint are incorporated herein by reference as if set forth at length.

193.    Section 3729(a)(2) of the FCA provides liability for any person who knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States government.  See 31 U.S.C. § 3729(a)(2).

194.    The reports Medco offered to demonstrate its compliance with the Contracts with Federal Clients were records presented to the United States either directly or through the intervening union or health plan.

195.    The records were false for the reasons specified in Sections VII and VIII, above.

196.    From 1993 through at least April 2004, Medco submitted these records to the United States knowing that they were false and for the purpose of obtaining payment of false claims from the United States and for obtaining new contracts with the United States.

197.    As a result of the false claims, the United States was damaged in that it paid for services that purported to, but did not, comply with the Contracts, paid for contractual bonuses that Medco did not earn, and failed to recover contractual penalties incurred by Medco.

198.    Due to result of the pervasive fraud engaged in by Medco and the Subsidiaries, Medco should be required to disgorge and pay to the United States all monies paid to Medco under the Contracts.

WHEREFORE, ███████ requests entry of judgment in favor of the United States, and against Merck & Co., Merck-Medco Managed Care, Medco Health, and the Subsidiaries, in an amount equal to triple the damages sustained by reason of their conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, plus ███ reasonable attorney fees, expenses, and costs.

### Count III
### Violation of § 3729(a)(2) of the False Claims Act by the Individual Defendants

199    The foregoing paragraphs of this Complaint are incorporated herein by reference as if set forth at length.

200.    Section 3729(a)(2) of the FCA provides liability for any person who knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States government.  See 31 U.S.C. § 3729(a)(2).

201.    The reports Medco offered to demonstrate its compliance with the Contracts were records presented to the United States.

202.    The records were false for the reasons specified in Sections VII and VIII, above.

203.    From 2001 through at least April 2004, the Individual Defendants caused to be created records that they knew would be submitted to the Federal Clients knowing

that the records were false, and did so for the purpose of obtaining payment of false claims from the United States and for obtaining new contracts with the United States.

204.   As a result of the false claims, the United States was damaged in that it paid for services that purported to, but did not, comply with the Contracts, paid for contractual bonuses that Medco did not earn, and failed to recover contractual penalties incurred by Medco.

WHEREFORE, ██████████ requests entry of judgment in favor of the United States, and against the Individual Defendants, in an amount equal to triple the damages sustained by reason of their conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, plus ███ reasonable attorney fees, expenses, and costs.

## Count IV
## Violation of § 3729(a)(7)

205.   The foregoing paragraphs of this Complaint are incorporated herein by reference as if set forth at length.

206.   Section 3729(a)(7) of the FCA provides liability for any person who knowingly makes, uses or causes to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the United States government.  See 31 U.S.C. § 3729(a)(7).

207.   The reports Medco offered to demonstrate its compliance with the Contracts were records presented to the United States either directly or through the intervening union or health plan.

208.   The records were false for the reasons specified in Sections VII, VIII, and IX, above.

209.    From 1993 through at least April 2004, Medco submitted these records to the United States knowing that they were false and for the purpose of avoiding penalties to be paid to the United States under the Contracts.

210.    As a result of the false claims, the United States was damaged in that it failed to recover penalties incurred by Medco.

WHEREFORE, ███████ requests entry of judgment in favor of the United States, and against Merck & Co., Merck-Medco Managed Care, Medco Health, and the Subsidiaries, in an amount equal to triple the damages sustained by reason of their conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, plus ██ reasonable attorney fees, expenses, and costs.

McNEES WALLACE & NURICK LLC

By _____
        David M. Barasch
        Donald B. Kaufman
        Kandice J. Giurintano
        100 Pine Street
        P.O. Box 1166
        Harrisburg, PA 17108-1166
        (717) 232-8000
        (717) 237-5300 (fax)

Dated: November  15 , 2004          Attorneys for Relator ███████

42

## <u>CERTIFICATE OF SERVICE</u>

I certify that I have this day served a copy of the foregoing document upon the parties listed below by certified mail, postage prepaid, which service satisfies the requirements of Fed. R. Civ. P. 5.

Civil Process Clerk
United States Attorney's Office
615 Chestnut Street
Suite 1250
Philadelphia, PA  19106

*Counsel for Plaintiff*

Dated:  November 15, 2004

David M. Barasch